UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| S. CARL MORELLO, *et al.*, <br>      *Plaintiffs*, <br>        *v.* <br> LIAM E. MCGEE, *et al.*, <br>      *Defendants*. | Civil No. 3:13cv586 (JBA) <br><br> May 27, 2014 |

**RULING ON DEFENDANTS' MOTION TO DISMISS**

Defendants, certain former and current board members and executives of the Hartford Financial Services Group, Inc. ("Hartford Financial"), move [Doc. # 49], to dismiss Plaintiff's Second Amended Complaint [Doc. # 51], a shareholder derivative suit seeking damages arising from a misstatement in financial statements related to Hartford Financial's sale of its life insurance unit.[1]  For the reasons that follow, Plaintiffs' failure to demand that the directors bring this derivative suit and failure to plausibly plead demand futility require that Defendants' motion be granted.

I.      **Facts**

Plaintiffs, two individual Hartford Financial shareholders—S. Carl Morello and Albert Hartman—and the Iron Workers District Council of Tennessee Valley & Vicinity Pension Plan, bring this derivative action on behalf of Hartford Financial.  They name as

---

[1] The complaint asserts claims against all Defendants for breach of fiduciary duty for disseminating false and misleading information (Count One), breach of fiduciary duty for failing to maintain internal controls (Count Two), and unjust enrichment (Count Three).  Plaintiffs seek unspecified damages, an order directing Hartford Financial "to take all necessary actions to reform and improve its corporate governance and internal procedures," restitution and disgorgement of profits from Defendants, and attorneys' fees.

Defendants nine Hartford Financial board members (the "Director Defendants"), including Liam E. McGee, CEO and Chairman of the Board, and three other Hartford Financial officers:  Christopher J. Swift, Chief Financial Officer; Robert Rupp, Chief Risk Officer; and Robert H. Bateman, Senior Vice President and Controller from August 2012 through May 2013.  Of the Director Defendants, only Mr. McGee is otherwise affiliated with the company; the others[2] are referred to as "Outside Directors."  All of the Director Defendants are alleged to be members of the Finance, Investment, and Risk Management Committee of the Board (the "Risk Committee Defendants"), and Defendants Allardice, Fetter, Morris, and Strauss are alleged to be members of the Board's Audit Committee (the "Audit Committee Defendants").  (*See* 2d Am. Compl. ¶¶ 12–30.)

The factual context of the Second Amended Complaint supporting Plaintiffs' claims is as follows.  In September 2012, Harford Financial sold its life insurance business to Prudential Financial Inc. for $615 million, structured as a reinsurance transaction, as part of a company-wide initiative to focus on other business areas.  Hartford Financial announced the transaction in a September 27, 2012 press release which stated that the company did "not expect to record a material net income gain or loss on the closing of the transaction, based on June 30, 2012, financials."  (*Id.* ¶ 42.)  Following the transaction, on November 1, 2012, Hartford Financial announced net income of $401 million for the third quarter of 2012.  (*Id.* ¶ 43.)  Net income for the 2012 fiscal year was therefore reported as $350 million.  (*Id.* ¶ 46.)

---

[2] Robert B. Allardice III, Trevor Fetter, Paul G. Kirk, Jr., Kathryn Mikells, Michael G. Morris, Thomas A. Renyi, Charles B. Strauss,  and H. Patrick Swygert.

Plaintiffs' allege that the company's press releases and SEC filings reporting these earnings were "materially false and misleading" as evidenced by subsequent events. (*Id.*) On March 1, 2013, Hartford Financial issued a press release announcing that it was amending its 2012 third quarter financial results to reflect that the sale to Prudential would result in an estimated loss of $393 million rather than no "material gain or loss" as originally announced. (*Id.* ¶ 56.) The press release stated that "[t]he error resulted from the omission of the impact of certain reinsurance recoverable balances on the gain/loss calculations for the transaction" because the company had originally failed to adequately account for "the impairment of goodwill and the establishment of a loss accrual for premium deficiency." Hartford Financial's press release cited a "material weakness in its internal control over financial reporting [for the quarter ending] September 30, 2012, which was remediated as of December 31, 2012" and advised that its previously-filed 2012 third-quarter financial result "should no longer be relied upon." (*Id.*)

Hartford Financial's 2012 third quarter net income was restated down by over 96 percent from $401 million to $13 million and its net income for the 2012 fiscal year was amended from a profit of $350 million to a loss of $38 million. (*Id.* ¶¶ 56–57.) Plaintiffs allege that this restatement of financial results "is an effective admission by Defendants that" the originally-reported financial results "were materially false and misleading," and "were incorrect based on information available to the Individual Defendants at the time the results were originally reported." (*Id.* ¶ 59.)

Plaintiffs further allege that "by allowing or by themselves causing [] the dissemination of materially inflated financial statements in violation of" Generally Accepted Accounting Principles ("GAAP"), Defendants demonstrated "a knowing and

3

culpable violation of their obligations as officers and directors of Hartford, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company." (*Id.* ¶¶ 37–38.)

Plaintiffs seek "to redress the breaches of fiduciary duty[,] waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Defendants." (*Id.* ¶ 64.)  As a result of these breaches, Plaintiffs allege that Hartford Financial has been damaged (1) by paying excessive compensation to "certain of the Defendants" who were paid "at least in part" on the false financial result (*id.* ¶ 61); (2) the company will suffer from a "liar's discount," meaning that due to the "improper behavior" and misleading statements "Hartford's ability to raise equity capital or debt on favorable terms in the future is now impaired" (*id.* ¶ 62); and (3) Hartford Financial will have to expend "significant sums of money," including costs related to the untimely goodwill write-down and loss accrual, and benefits paid to Defendants (*id.* ¶ 63).

Plaintiffs acknowledge that before bringing this derivative action, they never made a demand upon the board to pursue Hartford Financial's claims for relief as required, but maintain that this omission is excusable because all Defendants face a "substantial likelihood of liability for their breaches of fiduciary duties and any demand upon them is futile." (*Id.* ¶¶ 66–77.)

II.     **Discussion**

Defendants move to dismiss the Second Amended Complaint because Plaintiffs failed to make a prior demand upon Hartford Financial's board of directors to pursue this derivative claim and fail to plausibly allege facts showing that Plaintiffs' failure is justified as futile because of the directors' role in the alleged misconduct at issue.

A.      **The Demand Requirement**

There is no dispute that because Hartford Financial is incorporated in Delaware, the demand requirement is governed by Delaware law under which a "cardinal precept of the General Corporation Law of the State of Delaware is that directors, rather than shareholders, manage the business and affairs of the corporation.  By its very nature the derivative action impinges on the managerial freedom of directors." *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984).  To preserve director control, Delaware law requires that "a plaintiff shareholder [must] make a demand upon the corporation's current board to pursue derivative claims owned by the corporation before a shareholder is permitted to pursue legal action on the corporation's behalf."  *In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 808, 820 (Del. Ch. 2005) (quoting *Jacobs v. Yang,* 2004 WL 1728521, at *2 (Del. Ch. Aug. 2, 2004) (alterations in original)).   The demand requirement thus "constitutes the procedural embodiment of this substantive principle of corporation law." *Rales v. Blasband*, 634 A.2d 927, 932 (Del. 1993).   "[T]he right of a stockholder to prosecute a derivative suit is limited to situations where the stockholder has demanded that the directors pursue the corporate claim and they have wrongfully refused to do so or where demand is excused because the directors are incapable of making an impartial decision regarding such litigation." *Id.*

5

Rule 23.1 of the Federal Rules of Civil Procedure (and its equivalent under Delaware law) require that a plaintiff bringing a derivative action "state with particularity" its efforts to make a demand upon the directors or "the reasons for not . . . making the effort," including pleading "particularized factual allegations" that "create a reasonable doubt that, as of the time the complaint is filed, [a majority of] the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." *Rales*, 634 A.2d at 934; *see also Anderson*, 473 A.2d at 815 n.8.

The board members' interestedness can be demonstrated in two ways. First, by showing that "a director either has received, or is entitled to receive, a personal financial benefit from the challenged transaction which is not equally shared by the stockholders." *Pogostin v. Rice*, 480 A.2d 619, 624 (Del. 1984). Second, "in rare cases" where "a transaction may be so egregious on its face" such that "a substantial likelihood of director liability therefore exists." *Aronson*, 473 A.2d at 815. A "substantial likelihood" requires more than director participation in the alleged wrongful conduct or "the mere threat of personal liability for approving a questioned transaction." *Id.* at 814–15; *see also Lewis v. Graves*, 701 F.2d 245, 248 (2d Cir. 1983) ("The fact that a corporation's directors have previously approved transactions subsequently challenged in a derivative suit does not inevitably lead to the conclusion that those directors, bound by their fiduciary obligations to the corporation, will refuse to take up the suit.").

**B.**     **Count One:  False or Misleading Statements**

Plaintiffs assert the second form of demand futility, contending that all of the board members "face a substantial likelihood of liability, excusing demand."[3]  (Pls.' Mem. Opp'n [Doc. # 52] at 22.)   As to Count One, Plaintiffs allege that Defendants face a substantial likelihood of liability for knowingly disseminating "false or misleading statements," because "it is reasonable to infer" that the four Audit Committee Defendants who were required under Hartford Financial's Audit Committee Charter "to review the integrity of the Company's financial statements and the Company's earnings press releases and guidance prior to their issuance—were or should have been well-aware of the true effect of the Transaction on Hartford's financial results at the time those statements were issued."  (*Id.* at 20.)

Plaintiffs also contend that all of the Director Defendants face a substantial likelihood of liability by virtue of their membership on the Risk Committee, because—according to Hartford Financial's press release accompanying the transaction—they all participated in a "rigorous evaluation" of the deal before it occurred and were responsible

---

[3] Although Plaintiffs allege that "certain of the Defendants have received excessive executive compensation for 2012, due to the fact that their compensation was based (at least in part) on false financial results" (2d Am. Compl. ¶ 61), they only advance this compensation argument as to Defendant McGee, who is both the CEO and Chairman of the Board, not the eight Outside Director Defendants.  (Pls' Mem. Opp'n at 16 n.18.) Since Plaintiffs must establish that a majority of the board was interested, whether Mr. McGee is independent or not is immaterial here if at least five of the Outside Director Defendants are independent.  Defendants contend—and Plaintiffs do not dispute—that the Outside Directors would not have received any financial benefit from the financial misstatement, because they received "fixed compensation—a set retainer, meeting attendance fees, and an award of fixed dollar value of restricted stock units—that has nothing to do with Hartford's performance."  (Defs' Mem. Supp. [Doc. # 50] at 11 n.11.)

for a systematic failure of internal controls that allowed the misstatement to occur in the first place.  (*Id.* at 21–22.)   Defendants respond that under Hartford Financial's corporate charter, directors only face personal liability for intentional misconduct, which would not include that they "should have known" that the financial statements were false.  (Reply [Doc. # 55] at 4.)

As permitted by § 102(b)(7) of the Delaware General Corporation Law, Hartford Financial's articles of incorporation indemnify directors from personal liability to the maximum extent permitted except for breaches of a director's duty of loyalty to the corporation or "for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law."  (Defs.' Mem. Supp. at 13 n.12.)  Therefore, Plaintiffs must plead facts showing that the alleged conduct of a majority of directors falls outside the ambit of their protection from personal liability.[4]  *See In re Baxter Int'l*, 654 A.2d 1268, 1270 (Del. Ch. 1995) ("When the certificate of incorporation exempts directors from liability, the risk of liability does not disable them from considering a demand fairly unless particularized pleading permits the court to conclude that there is a substantial likelihood that their conduct falls outside the exemption.").

_____

[4] Plaintiffs maintain that reliance on this exculpatory provision is an "affirmative defense" that cannot be considered at the pleading stage.  (Pls.' Mem. Opp'n at 26.)  The cases cited in support of this proposition, however, do not involve demand futility, and Delaware courts have been clear that "[w]here directors are contractually or otherwise exculpated from liability for certain conduct, then a serious threat of liability may only be found to exist if the plaintiff pleads a non-exculpated claim against the directors based on particularized facts."  *Wood v. Baum*, 953 A.2d 136, 141 (Del. 2008) (internal quotation marks and emphasis omitted).

Plaintiffs' reliance on allegations that Defendants "should have known" of improprieties evokes a negligence standard for which Defendants would be indemnified. Defendants face personal liability only for *intentional* misconduct, *knowing* violations of the law, or acts or omissions not in good faith which also require intentionality. The "failure to act in good faith requires conduct that is qualitatively different from, and more culpable than, the conduct giving rise to a violation of the fiduciary duty of care (i.e., gross negligence)" and "may be shown . . . where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation, where the fiduciary acts with the intent to violate applicable positive law, or where the fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties." *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 369 (Del. 2006); *see also In re Pfizer, Inc. Derivative Sec. Litig.*, 307 F. App'x 590, 594 (2d Cir. 2009) ("[D]emand futility . . . requires both a showing of knowledge and that the knowledge created an affirmative duty to act, which the directors consciously ignored.").

As for actual knowledge, Plaintiffs maintain that knowledge and bad faith can be inferred from the Audit Committee Defendants' responsibility to review financial statements before they were issued and that all of the Director Defendants admitted participation in the transaction. Under Delaware law, however, a director's participation in a transaction is not sufficient on its own to support an inference of bad faith. For example, in *Wood v. Baum*, 953 A.2d 136, 139 (Del. 2008), the plaintiff filed a derivative suit against the board of a financial services corporation, alleging a breach of fiduciary duty predicated on the company improperly valuing "certain non-performing assets" in violation of GAAP and SEC standards. As a result, the company "issued false financial

9

statements concerning the value and performance of those assets." *Id.* The plaintiff did not make a pre-filing demand upon the directors, but asserted that demand futility had been established because the defendants executed the allegedly false statements and annual reports and authorized certain of the allegedly improper transactions. *Id.* at 142. The directors were exculpated from liability except for "fraudulent," "illegal" or "bad faith" conduct. *Id.* at 141.

The Delaware Supreme Court held that the board's execution of the allegedly false financial reports provided an insufficient basis for inferring demand futility because "Delaware law on this point is clear: board approval of a transaction, even one that later proves to be improper, without more, is an insufficient basis to infer culpable knowledge or bad faith on the part of individual directors." *Id.* at 142. The *Wood* plaintiff's assertion that the membership of five board members on the audit committee was a sufficient factual basis upon which the requisite culpability could be inferred also failed, because this "assertion is contrary to well-settled Delaware law." *Id.*

At oral argument and in a post-argument letter brief [Doc. # 61], Plaintiffs attempted to distinguish *Wood* because it was brought on behalf of a Delaware limited liability company ("LLC") and not a Delaware corporation, such as Hartford Financial. However, *Wood* gives no indication that this distinction was of any relevance to the court's holding, which relied on derivative cases involving corporations, not LLCs, without discussion of any distinction between the two. *See Wood*, 953 A.2d at 142 (citing *Rattner v. Bidzos,* 2003 WL 22284323, at *13 (Del. Ch. Ct. Sept. 30, 2003); *Guttman v. Huang,* 823 A.2d 492, 498 (Del. Ch. 2003); *Aronson,* 473 A.2d at 814; *In re Citigroup Inc. S'holders Litig.,* 2003 WL 21384599, at *2 (Del. Ch. Ct. 2003)). Likewise, Delaware courts

have relied on *Wood* in cases involving corporations, *see, e.g., In re Citigroup Inc. S'holder Derivative Litig.,* 964 A.2d 106, 124–25, 134 (Del. Ch. 2009); *Raul v. Rynd,* 929 F. Supp. 2d 333, 348 (D. Del. 2013).

Plaintiffs rely primarily upon two out of Circuit securities fraud cases under the Private Securities Litigation Reform Act (PSLRA) against company officers, not directors, in arguing that actual knowledge of false statements can be inferred from the "size and historical significance of the Transaction—as well as the corresponding size of the loss to Hartford" Financial.[5]  (Pls.' Opp'n at 19.)  In both cases, however, the courts did not infer actual knowledge of false statements based on the size and significance of a transaction alone.

In *Chalverus v. Pegasystems, Inc.*, 59 F. Supp. 2d 226, 228 (D. Mass. 1999), the plaintiffs alleged that a company's president and chief executive officer and company's chief financial officer issued a press release announcing a contract that the company represented would result in a $50 million profit for the company without disclosing that the company had assumed an obligation to pay $12.9 million to the other party in connection with the agreement.  In holding that the plaintiffs had alleged a strong inference of scienter, the court relied not just on the magnitude of the transaction, but also four additional factors:  (1) the company's failure to report revenue in accordance with GAAP, (2) the company's violation of its internal policy for recognizing revenue, (3) the company's omission of the $12.9 million obligation assumed in connection with the

---

[5] In order to sufficiently allege scienter under the PSLRA, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u–4(b)(2).

transaction, and (4) the officers' motives to commit fraud in order to inflate stock prices because their compensation packages included stock and stock options.  *Id.* at 234–36.

Likewise in *In re Ancor Commc'ns, Inc.*, 22 F. Supp. 2d 999, 1005, 10001 (D. Minn. 1998), the court found that there was a strong inference of scienter under the PSLRA where the company announced what was "undeniably the most significant contract in [its] history" for software but the executives were aware and failed to report that there was a "significant possibility" that the contract would fall through due to compatibility issues. The court held that "knowledge of the potential incompatibility, within the context of this highly significant contract, may be imputed to Defendants and supports a strong inference of scienter" due to (1) the significance of the contract, (2) misrepresentations on SEC filings, and (3) stock trading by company insiders after the rise in stock value following the fraudulent disclosures.  *Id.* at 1006–05.

Thus in both *Chalverus* and *Ancor* there were additional factors present aside from a significant transaction from which an inference of knowledge could be drawn. Additionally both cases were against high-level corporate officers rather than outside directors.  As in *Wood*, Plaintiffs here have alleged no more than that a substantial likelihood of director liability can be inferred from the directors' involvement in the contested transaction and execution of the false financial statements.  Asked at oral argument to identify the specific particularized facts alleged, Plaintiffs relied primarily upon the press release accompanying the transaction, which they contend demonstrates the deep knowledge and involvement of each director, all of whom participated in a "rigorous evaluation" of the transaction.  (Pls.' Mem. Opp'n at 22.)  This press release, however, does not provide a basis for inferring that the misstatement was the result of

knowing misconduct or other bad faith by the directors since the notice states that the sale was "the result of management and the Board of Directors' rigorous evaluation of the company's strategy and business portfolio conducted over . . . several quarters." (2d Am. Comp. ¶ 41 (alteration omitted).)   On its face, therefore, the directors' "rigorous evaluation" refers to the strategic decision to enter into the transaction, and does not support an inference of Defendants' knowledge of and bad faith in issuing the financial misstatement.[6]   *See Wood*, 953 A.2d at 140 (Del. 2008) ("The Court should draw all *reasonable* inferences in the plaintiff's favor.   Such reasonable inferences must logically flow from particularized facts alleged by the plaintiff.   Conclusory allegations are not considered as expressly pleaded facts or factual inferences." (internal quotation marks and alterations omitted)).

Accordingly, Plaintiffs have not pled sufficiently particularized facts to support a reasonable inference that the requirements for demand futility have been established.   *See Rahbari v. Oros*, 732 F. Supp. 2d 367, 386 (S.D.N.Y. 2010) ("No allegation of specific knowledge is made regarding these defendants, and plaintiff relies solely on the fact of their membership in the Audit Committee to support an inference of knowledge of illegality.   Consistent with the controlling Delaware law, we find that these defendants do

---

[6] Likewise there are no facts alleged that support an inference that even if Defendants were not aware of the misstatement at the time it was made that they later became aware of the falsity of the statement and failed to disclose the error before the March 1, 2013 announcement of the amended financial statements.

not face a substantial likelihood of liability merely because they serve on such a committee.").[7]

### C.    Count Two:  Failure of Internal Controls and Oversight

Plaintiffs assert that demand would be futile as to Count Two, because the Director Defendants face a substantial likelihood of liability for failing to maintain sufficient internal controls.  Derivative of the fiduciary duty of loyalty is "a duty to attempt in good faith to assure that a corporate information and reporting system, which the board concludes is adequate, exists, and that failure to do so under some circumstances may, in theory at least, render a director liable for losses caused by non-compliance with applicable legal standards."  *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959, 970 (Del. Ch. 1996).  Because the duty of oversight derives from directors' duty of loyalty, a violation necessarily involves a failure to act in good faith, *see Stone*, 911 A.2d at 370 (Del. 2006), but the showing required is "quite high," *Caremark*, 698 A.2d at 971; *see also Desimone v. Barrows*, 924 A.2d 908, 935 (Del. Ch. 2007) ("[D]irector liability for failure to monitor required a finding that the directors acted with the state of mind traditionally used to define the mindset of a disloyal director—bad faith—because their

---

[7] At oral argument, Plaintiffs cited *Westmoreland Cnty. Employee Ret. Sys. v. Parkinson*, 727 F.3d 719 (7th Cir. 2013) for the uncontested proposition that they need not plead facts showing Defendants' actual knowledge but rather can plead facts from which the reasonable inference of knowledge can be drawn.  In *Westmoreland*, however, the plaintiffs alleged that directors and officers breached their fiduciary duties by "consciously disregarding their responsibility to bring Baxter into compliance with [a] Consent Decree and related health and safety laws," setting forth "particularized facts (*e.g.,* meeting dates and minutes) indicating that the directors were intimately involved in overseeing the remedial effort" and that "the board took no action to ensure the company's timely compliance with the law, choosing instead to work on" the development of a new product.  *Id.* at 721, 726, 728.

indolence was so persistent that it could not be ascribed to anything other than a knowing decision not to even try to make sure the corporation's officers had developed and were implementing a prudent approach to ensuring law compliance.").

Although Plaintiffs' failure of oversight claim appears to be based on the so-called *Caremark* standard of a "systemic failure" to supervise (*see* Pls.' Mem. Opp'n at 21), their briefing and statements at oral argument confirm that they do not assert a *Caremark* claim of negligent failure to supervise (*id.* at 23–24).  Instead, Plaintiffs assert that their claim is based on intentional misconduct—that the Director Defendants "knew or had reason to know of serious issues related to the Transaction" and their liability "is based on information the court may reasonably infer was known to them."  (Pls.' Mem. Opp'n at 25–26.)  As discussed above, "knew or had reason to know" is not sufficient for demand futility, which requires particularized facts showing that the Director Defendants had knowledge of the misstatements or otherwise acted in bad faith.  As discussed above, Plaintiffs have not done so and thus Count Two fails for the same reasons as Count One. Count Three alleging unjust enrichment is based on the same facts as Counts One and Two and thus fails as well.[8]

---

[8] Dismissal of this action may not foreclose further judicial review.  If still timely, Plaintiffs can now make a demand on the board and thereafter judicially challenge any board decision refusing to pursue these claims.  "[A] board decision to cause a derivative suit to be dismissed as detrimental to the company, after demand has been made and refused, will be respected unless it was wrongful," which is reviewed under "the 'business judgment' rule and will be respected if the requirements of the rule are met."  *Zapata Corp. v. Maldonado*, 430 A.2d 779, 784 & n.10 (Del. 1981).  "The persuasive rationale for the demand requirement is that it allows directors to make a business decision about a business question: whether to invest the time and resources of the corporation in litigation."  *Starrels v. First Nat. Bank of Chicago*, 870 F.2d 1168, 1173 (7th Cir. 1989)

Plaintiffs requested that if this motion were granted, they be given leave to further amend their complaint but do not further elaborate on the basis for amendment (Pls.' Mem. Opp'n at 29 n.26), nor why they could not have included additional allegations when given the opportunity to amend to respond to Defendants' anticipated motion discussed in the prefiling conference held on June 27, 2013 (*see* Scheduling Order [Doc. # 42]).  Given that no basis for amending the complaint is provided, no leave to file a third amended complaint will be granted.  *See In re Pfizer, Inc. Derivative Sec. Litig.*, 307 F. App'x at 595 (affirming the district court's denial of leave to file an amended complaint after dismissal for failure to show demand futility); *see also Grossman v. Johnson*, 674 F.2d 115, 125 (1st Cir. 1982) ("Rule 23.1 specifically calls upon the complaint to show that demand was made or was properly excused; there is no provision for thereafter remedying an omission in the same suit, especially after the defendants have moved to dismiss because of the absence of a demand.").

---

(applying Delaware law) (Easterbrook, J. concurring).  Under the business judgment rule, directors "may conclude that internal remedies such as discharge or a reduction in compensation are more cost-effective" and that a "lawsuit that seems to have good prospects and a positive value (net of attorneys' fees) still may be an unwise business decision because of the value of managerial time that would have to be invested, time unavailable to pursue the principal business of the corporation.  Similarly, a lawsuit that appears to have a negative net value may be useful to the firm if it deters future misconduct."  *Id.* at 1173–74 (Easterbrook, J. concurring).  If these determinations are a valid exercise of business judgment, "where a demand is made and refused, absent a showing of wrongful conduct by the voting directors, the stockholder is simply without the legal ability to initiate a derivative action."  *Abramowitz v. Posner*, 672 F.2d 1025, 1030 (2d Cir. 1982).

16

III.     **Conclusion**

For the reasons discussed above, Defendants' Motion [Doc. # 49] to Dismiss is GRANTED in its entirety.  The Clerk is directed to close this case.


IT IS SO ORDERED.

_____/s/_____

Janet Bond Arterton, U.S.D.J.


Dated at New Haven, Connecticut this 27th day of May, 2014.

17